UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| CRYSTAL C. ROBINSON | : | |
| | : | |
| Plaintiff, | : | |
| | : | **COMPLAINT** |
| v. | : | (Jury Trial Demanded) |
| | : | |
| UNION COUNTY, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

COMES NOW the Plaintiff, Crystal Robinson (hereinafter "Plaintiff"), by and through her undersigned attorney, and hereby files this Complaint for damages and other legal and equitable relief from UNION COUNTY (hereinafter "Defendant") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981, and state law.

## NATURE OF THE CASE

1. This is an action brought by Plaintiff seeking damages from Defendants for acts of discrimination.

2. Plaintiff has worked for Defendant since 1998. During her time working for Defendant, Plaintiff has successfully held many positions, including positions as a Social Worker, Child Welfare Supervisor, and Community Engagement Specialist. In each position, Plaintiff has satisfactorily performed her job duties and consistently received glowing performance reviews and positive feedback.

3. In or around December of 2017, Defendant's Department of Social Services went through a restructuring due to management issues. Plaintiff agreed to transition to a new role as a Community Engagement Specialist to assist with the restructuring.

4. In 2021, after Plaintiff had successfully fulfilled her role as Community Engagement Specialist for a number of years, she sought to return to her previous position as a Child Welfare Supervisor. Despite her previous success and qualifications for the position, Plaintiff was not considered for even one of three supervisor positions that had become vacant at the time she applied. Rather, Defendant hired three of Plaintiff's Caucasian counterparts. At least one of the individuals hired was less qualified than, and had previously been supervised by, Plaintiff.

5. As a result of Defendant's conduct as alleged more particularly herein, Plaintiff is seeking damages and other legal and equitable relief from Defendants for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981, and state law.

## JURISDICTION & VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e *et seq.,* as amended, and (iii) 42 U.S.C. §§ 1981 *et seq.,* as amended.

7.  This Court has supplemental jurisdiction over Plaintiff's state law claims, which arise from a common nucleus of facts such that they form part of the same case or controversy, pursuant to 28 U.S.C. § 1367.

8.  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

9.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (c), and (d) in that the unlawful practices complained of occurred within this district and Defendant maintains offices and conducts business in this district.

## PARTIES

10. Plaintiff is a person who has been aggrieved by Defendant's actions. She is and has been, at all relevant times, a resident of North Carolina.

11. Plaintiff is an African American female.

12. At the time of Defendants' discriminatory acts, Plaintiff was an employee of the Union County Human Services Division of Social Services, located at 2330 Concord Ave, Monroe, North Carolina 28110.

13. Defendant, Union County, is a county pursuant to G.S. § 153A-10, is a body politic and corporate pursuant to G.S. § 153A-11, and is being sued as such under both state and federal law.

14. At all times herein mentioned, Defendant was an employer within the meaning of Title VII, having fifteen (15) or more employees.

15. At all times relevant to this action, Union County acted through its managers and policy makers, including those managing Union County Department of Social Services. The acts, edicts, and practices of these managers and policy makers represent the official policies of Union County.

3

16. The Union County Department of Social Services is, and at all relevant times was, one of the divisions comprising Union County Health Services, and thus, Union County Department Social Services is and was a division of Union County, North Carolina.

17. For the period complained of in this action, Union County has purchased liability insurance that provides coverage for Union County and employees for Plaintiff's claims.

18. Upon information and belief, Defendant has purchased liability insurance applicable to Plaintiff's claims and/or participates in a local government risk pool, and thus, pursuant to N.C.G.S. 153A-435, Defendant has waived its immunity from civil liability.

19. Furthermore, Title VII abrogates any Eleventh Amendment immunity that Defendant might claim in an attempt to immunize itself from suits against Defendant in its capacity as an employer. *See Fitzpatrick v. Blitzer*, 427 U.S. 445 (1976).

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

20. On August 18, 2021, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant failed to promote and/or hire Plaintiff based on Plaintiff's race.

21. Union County appeared and participated in the EEOC investigation whereby counsel submitted a position statement on behalf of Union County dated October 25, 2021.

22. According to the EEOC's Letter of Determination dated January 17, 2024, the EEOC had completed its investigation and found that "the evidence support[ed] [Plaintiff's] claim and [did] not support [Defendant's] defense." Particularly, the EEOC found the following:

> [Plaintiff] is African American. [Plaintiff] applied to a vacancy for three Senior Social Work Supervisor positions. [Plaintiff] met and/or exceeded the stated qualifications. [Plaintiff] was not considered for promotion. Three individuals outside of [Plaintiff's] protected class were selected for promotion. The evidence shows that one or more of the selected candidates

4

were less qualified than [Plaintiff]. There is reasonable cause to believe that [Defendants] violated Title VII.

23. On August 20, 2024, Plaintiff received her Notice of Right to Sue from the EEOC regarding EEOC Charge No. 430-2021-02274.

## STATEMENT OF FACTS

24. Plaintiff is an African American female.

25. Plaintiff commenced employment with Union County on April 7, 1998, as a Social Worker.

26. Plaintiff initially sought employment with Union County due to her lifelong goal of providing assistance to at-risk youths and at-risk communities.

27. On December 3, 2012, Plaintiff was promoted to a Child Welfare Supervisor for Union County.

28. Plaintiff then transitioned to a Community Engagement Specialist role in 2017.

29. At all relevant times, Union County employed a Director of Community Outreach and Health Promotions named Audrea Caesar (hereinafter "Ms. Caesar").

30. Ms. Caesar, in her capacity as Director of Community Outreach and Health Promotions, possessed and exercised the necessary authority to act on behalf of Union County. This authority included but was not limited to, making decisions, implementing policies, and undertaking actions central to the allegations contained herein. Such authority was vested in Ms. Caesar by virtue of her position as Director of Community Outreach and Health Promotions and was acknowledged and accepted by Union County. Therefore, any actions or decisions made by Ms. Caesar in this capacity are attributable to Union County.

31. Plaintiff reported directly to Ms. Caesar in or around February 2018.

32. At all relevant times, Union County employed a Program Administrator named Lisa Kawyn (hereinafter "Ms. Kawyn").

33. Ms. Kawyn, in her capacity as Social Work Program Administrator, possessed and exercised the necessary authority to act on behalf of Union County. This authority included but was not limited to, making decisions, and undertaking actions central to the allegations contained herein. Such authority was vested in Ms. Kawyn by virtue of her position as Program Administrator and was acknowledged and accepted by Union County. Therefore, any actions or decisions made by Ms. Kawyn in this capacity are attributable to Union County.

34. Plaintiff reported to Ms. Kawyn beginning in 2015 when Ms. Kawyn was promoted to Program Adminsitrator.

35. At all relevant times, Union County employed a Program Manager named Heather Horne (hereinafter "Ms. Horne").

36. Ms. Horne, in her capacity as Program Manager, possessed and exercised the necessary authority to act on behalf of Union County. This authority included but was not limited to, making decisions, and undertaking actions central to the allegations contained herein. Such authority was vested in Ms. Horne by virtue of her position as Program Manager and was acknowledged and accepted by Union County. Therefore, any actions or decisions made by Ms. Horne in this capacity are attributable to Union County.

37. Plaintiff reported directly to Ms. Horne in 2020.

38. At all relevant times, Union County employed an APS Social Work Supervisor named Cheri L. Traywick (hereinafter "Ms. Traywick").

39. At all relevant times, Union County employed a Consultant named Chuck Harris (hereinafter "Mr. Harris").

40. In or around 2016, Union County employed a Caucasian Investigative Social Worker named Katie Turner (hereinafter "Ms. Turner"), who reported directly to Plaintiff for approximately two years.

41. Throughout Plaintiff's tenure with Defendants, including when she was a Child Welfare Supervisor and a Community Engagement Specialist, she satisfactorily fulfilled her duties and received many favorable performance reviews.

42. During Plaintiff's time as a Child Welfare Supervisor, Plaintiff received the following positive feedback and performance reviews:

    a. On December 14, 2012, Janet Curlee, who upon information and belief was an employee of Defendant with supervisory authority, was a rater on Plaintiff's performance evaluation. Ms. Curlee stated the following:

> Crystal demonstrates her capable ability and knowledge as a leader through her relationships made in the agency and with the community partners. I have observed her approach difficult situations in a straightforward, respectful, and professional manner. Crystal took over the role as supervisor . . . on December [3], 2012. She has clearly taken the initiative for this responsibility and seeks guidance and support for the decisions made.

    b. On March 28, 2013, Ms. Curlee was a rater on Plaintiff's performance evaluation. Ms. Curlee stated the following:

> Crystal continues to meet the challenges of her new role as CPS intake supervisor while continuing the duties and responsibilities of the group home. Both are difficult tasks. However, Crystal meets the responsibilities head on and with determination and initiative. She is a self-motivator and encourages those around her to think out resolutions/outcomes before acting. Crystal does not hesitate to seek guidance and assistance from her supervisor.

    c. On May 6, 2014, Rae Alepa, who upon information and belief is an employee of Defendant with supervisory authority, was a rater on Plaintiff's performance review. Ms. Alepa stated in pertinent part that Plaintiff "has been working very hard over the

past several months improving the quality controls within her unit. Crystal is working hard with the QA program and is open to all recommendations made."

d.  On May 23, 2014, Plaintiff received emails from Ms. Kawyn and Ms. Traywick indicating that Plaintiff's team received 100% accuracy and that Plaintiff and her team "should be proud of this accomplishment."

e.  On May 27, 2014, Plaintiff received an email from Ms. Kawyn stating that Plaintiff's team had received "[a]nother 100% for Intake!"

f.  On June 10, 2014, Mr. Harris wrote an email to Plaintiff after observing her in her Child Welfare Supervisor position, which states in pertinent part:

I thought that you made effective use of your positive and engaging supervisory style in both meetings. You demonstrated a nice balance of interpersonal skill and supervisory direction . . . It's more challenging to provide feedback on an individual conference when it is with someone who is performing at a high level and there is little need for improvement . . . I've known agencies in which the staff dreaded team meetings. I can't imagine that you will ever have that problem. I hope this feedback is helpful to you.

g.  On July 12, 2014, Plaintiff received an email from Ms. Kawyn indicating the intake for June 2014 was "AWESOME."

h.  On August 31, 2014, Plaintiff received an email from Ms. Kawyn, which stated "way to go . . . Your team scored 100% each on two sets of reviews. You have really brought your team way ahead from where they were eight months ago. Thanks for making my job so easy".

i.  On October 9, 2014, Plaintiff received another email from Ms. Kawyn, which stated in relevant part "100% again- woohoo!"

j.  On October 12, 2014, Plaintiff received an email from Ms. Kawyn which stated "Great job Intake!" and indicated that the September 2014 intake was at "100%."

43. Despite her exemplary employment history with Union County, Plaintiff was dismissed from her employment due to alleged performance issues on June 24, 2016.

44. Plaintiff successfully appealed her termination and was re-instated in or around January 2017.

45. Upon information and belief, from in or around May of 2015 until approximately December of 2017, the Union County Social Services Department suffered high levels of employee dissatisfaction and a high rate of staff turnover due to Ms. Kawyn's lackluster leadership. Consequently, Union County restructured social services and formed the new division of Community Support and Outreach.

46. Due to personal needs and her excitement about the restructuring, Plaintiff offered to assist with the restructuring and requested to be moved to a new position. Plaintiff was the transferred from Social Work Supervisor III to Social Worker III-IAT, the Community Engagement Specialist role, on December 19, 2017.

47. Despite multiple assurances to the contrary, Plaintiff received less pay in her new position. As such, Plaintiff's new position was technically, and unfortunately, considered to be a demotion. However, this "demotion" was based solely on socials services' restructuring and Plaintiff's request. It was not based, in any way, on any allegations of performance issues.

48. During Plaintiff's time as a Community Engagement Specialist, Plaintiff received the following positive feedback and performance reviews:

   a. On May 11, 2018, Ms. Kawyn was a rater on Plaintiff's performance evaluation and wrote "Crystal consistently goes above and beyond to serve her clients. She maintains a strong connection to those in the community and is able to use her relationships to obtain guidance and services. She empathizes with her clients and has an endearing approach to serving those less fortunate".

b. On August 16, 2018, Ms. Caesar was a rater on Plaintiff's performance evaluation and wrote "Crystal is truly committed to working with the community. Her strengths are working with a team to accomplish a goal. Crystal has been a team player and has been on top of everything I have assigned".

c. On December 27, 2018, Ms. Caesar was a rater on Plaintiff's performance evaluation and wrote "WOW! What an amazing year! Thank you for all of your hard work and efforts to put Community Support & Outreach on the map. I am looking forward to seeing what you all will do for next year."

d. On May 8, 2020, Ms. Horne was a rater on Plaintiff's performance evaluation and wrote the following:

> Crystal truly cares about our image across the county and how our actions and programs are reflected in the community. She has completed every task I have ever asked her to do, even when it is something out of her comfort zone. I am proud of her personal accomplishments in her professional development and have seen a lot of growth and enthusiasm in her the past few months. She enjoys learning new things and being able to serve our community. She has assisted me in settling in & introducing me to contacts and fellow staff. She encourages me and others around her to be better employees and to serve our community every day, in any way possible.

e. On May 12, 2021, Ms. Horne was a rater on Plaintiff's performance evaluation and wrote the following:

> In conclusion, this past year Crystal has truly shown what a dedicated asset she is to Union County. We have done amazing work together in Health Promotions and Community Engagement and there were only 2 of us. We met each day's goals and challenges and anything thrown our way. We responded and served our community with pride and integrity. I am proud to serve the citizens of Union County alongside Crystal and I look forward to the coming year to see what all we can accomplish. I will continue to support her as a manager to provide whatever she needs to always do her job and complete her responsibilities. She has demonstrated her abilities and dedication and high level of customer service this year to more than just me, but our organization as a whole appreciates her willingness to always go the extra mile for our customers.

f.  On May 6, 2022, Ms. Horne was a rater on Plaintiff's performance evaluation and wrote

the following:

> I can not repeat it often enough that Crystal is a true asset to our organization. She and I both feel that she has found her niche, that combines her background skills and knowledge and love for our community. She represents our organization in a very positive light and takes much pride in her work and results. She always puts the customer first and is a wonderful co-worker to so many, personally and professionally. She is an invaluable resource for our community, within the churches and partner organizations, and I hope she'll remain actively engaged with us and always help us to promote health education messaging in her circles, even after her retirement. She is known across the agency as a "go to" person that gets things done, and other departments rely on her heavily for assistance, especially during their busiest seasons. She is a TEAM player and exemplifies this daily. She's helped to elevate and give credibility to our Health Promotions' team. She's not divisive nor territorial, and just wants to help however she can. She never hesitates to offer suggestions and step in when asked for assistance. Her work with our Sr Nutrition program was above and beyond this past year, and we are very grateful for her willingness to fill the vacancies and feed our Seniors. I'm still trying to talk her out of leaving us, but I know she has served selflessly and done it well for the few years that I have known her. She deserves to enjoy her upcoming retirement, but I do dread the day when she leaves us, as she leaves very large shoes to fill

49. Plaintiff held her position as a Community Engagement Specialist for approximately four

years before she sought to transition back to her prior role of Child Welfare Supervisor.

50. In or around 2021, Union County posted three vacancies for the Child Welfare Supervisor

position. Plaintiff submitted one application; however, upon information and belief, each

position used the same criteria and/or requirements, and Plaintiff should have been

considered for all three vacancies.

51. Despite her qualifications and prior experience with Union County in this role, Plaintiff was

not afforded an interview.

52. Despite having extensive and direct experience in this exact role, Plaintiff was not selected for these positions.

53. Instead, Ms. Turner, who had less experience than Plaintiff and previously worked directly under Plaintiff's supervision, was one of the individuals selected for the Child Welfare Supervisor position that Plaintiff applied for.

54. Ms. Turner is a Caucasian female.

55. Upon information and belief, Union County selected three individuals, including Ms. Turner, outside of Plaintiff's race to fulfill these vacancies.

56. At least one of the candidates selected, namely Ms. Turner, was less qualified than Plaintiff.

57. At all relevant times, and has demonstrated by her history of employment with Union County, Plaintiff had the skills, experience, and education for the position of Child Welfare Supervisor.

58. Throughout her employment with Union County, Plaintiff has satisfactorily performed her job, as evidenced by her performance reviews and successful appeal of an improper termination.

59. Union County has exhibited a policy, custom, and/or pattern of not promoting and/or hiring African Americans to supervisory positions.

60. Upon information and belief, as of the present date, Union County employs a significantly higher number of Caucasian supervisors than African American supervisors.

61. Upon information and belief, most African Americans in supervisory positions were placed there by other African Americans.

62. Plaintiff was treated differently and less favorably than her Caucasian co-workers.

63. Plaintiff suffered adverse treatment due to Union County's harmful policies and/or customs as described hereinabove.

64. Union County's policies and/or customs enabled the aforementioned discrimination because no safeguards were set in place to protect Plaintiff from discrimination.

65. Plaintiff filed an EEOC Charge of Discrimination on August 18, 2021, alleging discrimination based on race.

66. Defendant's counsel submitted a position statement on behalf of Union County on October 25, 2021.

67. Plaintiff then filed a rebuttal to the position statement.

68. Per *Chisholm v. United States Postal Serv.*, "[a]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." 665 F.2d 482, 491 (4th Cir. 1981).

69. Moreover, as long as a "plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000).

70. Plaintiff's Charge of Discrimination, Defendants' Position Statement, and Plaintiff's Rebuttal set forth and address the causes of action that are delineated in Plaintiff's Complaint below.

71. The EEOC conducted their investigation and issued a determination on January 17, 2023, finding that there is reason to believe a violation occurred.

72. The EEOC issued a right to sue on August 20, 2024.

## FIRST CAUSE OF ACTION
### Failure to Promote based on Race in Violation of Title VII 42 U.S.C. § 2000e *et seq.*

73. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully stated forth herein.

74. To state a valid prima facie case of a discriminatory failure to promote, Plaintiff must show that (1) she is a member of a protected group, (2) she applied for the position, (3) she was qualified for the position, and (4) she was rejected under circumstances giving an inference of unlawful discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994).

75. As an African American female, Plaintiff is a member of a protected class.

76. At all relevant times throughout her employment, Plaintiff has satisfactorily performed her job at a level that met her employer's legitimate expectations, as evidenced by her performance reviews, emails from her supervisors, and overall positive feedback regarding her work.

77. In or around 2021, Plaintiff submitted an application for a Child Welfare Supervisor position. Upon information and belief, there were three vacancies, and because each position used the same criteria and/or requirements, Plaintiff should have been considered for all three vacancies.

78. Plaintiff was qualified for the Child Welfare Supervisor position, as evidenced by her education and extensive work experience with Defendant. This is particularly true given that Plaintiff had already successfully fulfilled the role of Child Welfare Supervisor before she stepped down due to social services' reorganization.

79. Plaintiff suffered an adverse action when she was not selected for the Child Welfare Supervisor position for which she applied.

80. Plaintiff was rejected for the position of Child Welfare Supervisor under circumstances giving inference to unlawful discrimination.

81. The Child Welfare Supervisor vacancies were filled by Caucasian females, three individuals outside of Plaintiff's protected class.

82. Plaintiff was more qualified for the role than at least one of the Caucasian females selected for the position, namely Ms. Turner.

83. Plaintiff was treated less favorably than her Caucasian counterparts that were selected to advance through the application process.

84. Union County has a policy and/or custom of discrimination in that, upon information and belief and as of the present date, Union County employees a significantly higher number of Caucasian supervisors than African American supervisors. Moreover, upon information and belief, most African Americans in supervisory positions were placed there by other African Americans.

85. The adverse action taken against Plaintiff was motivated by her race, thus, Plaintiff would not have been subjected to an adverse action but for her race.

86. Union County's harmful policies and/or customs enabled racial discrimination against Plaintiff, or at the very least and due to lack of safeguards, failed to protect Plaintiff from racial discrimination.

87. Union County's actions as described herein were willful and wanton and done with reckless disregard for Plaintiff's protected rights.

88. As a direct and proximate result of the above-described discrimination, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

## SECOND CAUSE OF ACTION
## Race Discrimination in Violation of Title VII 42 U.S.C. § 1981

89. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully stated forth herein.

90. U.S.C.S. 42 U.S.C. 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts [. . .] as is enjoyed by white citizens." *See Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369 (2004).

91. To state a valid prima facie case of a discriminatory failure to promote in violation of § 1981, Plaintiff must show that "(1) she was a member of a protected class; (2) she applied for the promotion in question; (3) she was qualified for the promotion; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir. 1995).

92. As an African American female, Plaintiff belongs to a statutorily protected category.

93. At all relevant times throughout her employment, Plaintiff has satisfactorily performed her job at a level that met her employer's legitimate expectations, as evidenced by her performance reviews, emails from her supervisors, and overall positive feedback regarding her work.

94. In or around 2021, Plaintiff submitted an application for a Child Welfare Supervisor position. Upon information and belief, there were three vacancies, and because each position used the same criteria

95. Plaintiff was qualified for the Child Welfare Supervisor position, as evidenced by her education and extensive work experience with Defendant. This is particularly true given that Plaintiff had already successfully fulfilled the role of Child Welfare Supervisor before she stepped down due to social services' reorganization.

96. Plaintiff suffered an adverse action when she was not selected for the Child Welfare Supervisor position for which she applied.

97. Plaintiff was rejected for the position of Child Welfare Supervisor under circumstances giving inference to unlawful discrimination.

98. The Child Welfare Supervisor vacancies were filled by Caucasian females, three individuals outside of Plaintiff's protected class.

99. Plaintiff was more qualified for the role than at least one of the Caucasian females selected for the position, namely Ms. Turner.

100. Plaintiff was treated less favorably than her Caucasian counterparts that were selected to advance through the application process.

101. Union County has a policy and/or custom of discrimination in that, upon information and belief and as of the present date, Union County employees a significantly higher number of Caucasian supervisors than African American supervisors. Moreover, upon information and belief, most African Americans in supervisory positions were placed there by other African Americans.

102. The adverse action taken against Plaintiff was motivated by her race, thus, Plaintiff would not have been subjected to an adverse action but for her race.

103. Union County's harmful policies and/or customs enabled racial discrimination against Plaintiff, or at the very least and due to lack of safeguards, failed to protect Plaintiff from racial discrimination.

104. Union County's actions as described herein were taken in willful and wanton disregard for Plaintiff's rights under § 1981.

105. As a direct and proximate result of the above-described discrimination, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

### THIRD CAUSE OF ACTION
**Intentional Infliction of Emotional Distress**

106. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

107. To state a claim for intentional infliction of emotional distress, plaintiff must allege facts sufficient to show the following three elements: (1) extreme and outrageous conduct, (2) which is intended to cause or with reckless indifference to the likelihood that they will cause, (3) severe emotional distress to another. *Dickens v. Puryear*, 302 N.C. 437, 453 (1981).

108. Defendant's acts of discrimination as alleged hereinabove, including but not limited to, (1) treating Plaintiff's Caucasian counterparts more favorably, (2) failing to promote Plaintiff based on her race, (3) enacting or failing to remedy policies and/or customs that facilitate racial discrimination, and (4) failing to implement safeguards to prevent racial discrimination in the workplace, were extreme and outrageous.

109. Defendant performed this conduct with intent to cause or with reckless indifference to the likelihood that it would cause Plaintiff's severe emotional distress.

110. Plaintiff suffered severe emotional distress and mental anguish as a result of Defendant's discriminatory conduct.

111. As a direct and proximate result of the conduct described herein, Plaintiff has suffered and is entitled to recovery of damages to be determined at a trial of this matter.

### FOURTH CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**

112. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

113. Under North Carolina state law, a cause of action for negligent infliction of emotional distress is established when the defendant negligently engaged in conduct in which it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and the conduct did in fact cause the plaintiff severe emotional distress. *Sorrells v. M.Y.B. Hospitality Ventures of Asheville*, 334 N.C. 669, 435 S.E.2d 320 (1993) (citing *Johnson v. Ruark Obstetrics and Gynecology Assocs.*, 327 N.C. 283, 395 S.E.2d 85 (1990)).

114. Defendant had a duty to exercise reasonable care to avoid cause emotional distress to Plaintiff.

115. Defendant's discriminatory conduct as alleged hereinabove breached its duty of care owed to Plaintiff.

116. Given that it is universally known that discrimination in the workplace is harmful and offensive, coupled with Defendant's history of discrimination and the uneven ratio of Caucasian and African American supervisors employed at Defendant's Department of Social Services, Defendant could reasonably foresee that the discriminatory conduct as alleged above could severely impact Plaintiff's employment, health, and livelihood.

117. Plaintiff suffered severe emotional distress and mental anguish as result of Defendant's actions.

118. As a direct and proximate result of the conduct described herein, Plaintiff has suffered and is entitled to recovery of damages to be determined at a trial of this matter.

## **DAMAGES**

119. As a result of the aforementioned conduct, Plaintiff has sustained permanent injury to her reputation; economic injuries; emotional and mental injuries; violation of her integrity; loss

of valuable time; embarrassment, humiliation, compensatory damages; punitive damages; and all other injuries set forth above.

**WHEREFORE**, Plaintiff respectfully prays as follows:

1.  That the Court empanel a jury to hear her cause;

2.  A judgment declaring that the practices complained of herein are unlawful and in violation of both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*;

3.  All damages which Plaintiff has sustained because of Defendant's conduct, including backpay, frontpay, general and specific damages for lost compensation, and job benefits she would have received but for Defendant's unlawful employment practices, and for emotional distress, humiliation, embarrassment, and anguish;

4.  Exemplary and punitive damages in an amount commensurate with Defendants' ability and to deter future malicious, reckless, and/or intentional conduct;

5.  Awarding Plaintiff the costs and disbursements incurred in connection with this action, including reasonable attorney's fees, expert witness fees and other costs;

6.  Pre-judgment and post-judgment interest, as provided by law;

7.  That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law; and

8.  Granting Plaintiff other and further relief as this Court finds necessary and proper.

(Signature on next page)

This the 17th day of November, 2024.

/s/M. Anthony Burts II
M. Anthony Burts II
Attorney for Plaintiffs
N.C. State Bar No.: 49878
PO Box 102
Newton, NC 28658
Telephone (704) 751-0455